DEXTER & VEAZIE, plaintiffs in error, *agt.* ADAMS, sheriff, &c., defendant in error.

### Questions discussed.

1. Whether a plaintiff can maintain an action against the sheriff, for an *escape* of a prisoner confined to the jail limits, if the escape be procured by the fraudulent contrivances and devices of the person employed by the plaintiff to commence the suit, without the authority, knowledge or assent of the plaintiff of such fraudulent acts?

2. Whether the plaintiff can adopt such an escape, procured for his benefit, and repudiate the means by which it was procured; or whether he must not adopt all or none of the unauthorized acts of the person acting as his agent, and for his benefit?

3. Whether fraud was committed in this case upon the prisoner, to induce him to leave the limits?

4. Whether it should not have been left to the jury to say that, if they believed that the prisoner was aware at the time he went where he did, he forfeited his limit bond and made the sheriff liable for an escape, whether the message to decoy him off was true or false, and with such knowledge, went deliberately off the limits, that then the sheriff was liable, though the message sent to get him off was false?

5. Whether the court erred in admitting the testimony of the prisoner after a release by the sheriff, or whether such release divested him of his interest in the event of the suit?

6. Where it was alleged that an objection was not taken at the circuit, had it have been, it might have been obviated, whether this court would listen to it?

CHAUNCEY DEXTER and Provost Veazie, plaintiffs, by *Wm. J. Hadley,* their attorney, sued Amos Adams, sheriff of the city and county of Albany, in the Albany mayor's court, in debt, for the escape of one John F. Jenkins from the jail limits of the city and county of Albany. Jenkins being in custody of the sheriff upon a *ca. sa.* issued at the suit of the plaintiffs for $125.50 upon and by virtue of a certain judgment rendered in the mayor's court of the city of Albany, on the 14th February, 1842, in a plea of trespass on the case, recovered by

Dexter & Veazie *agt.* Adams.

said plaintiffs against said Jenkins; and which was then unpaid and unsatisfied.

The defendant, by *Cagger & Stevens*, his attorneys, pleaded *nil debet,* and a special plea that said Jenkins wrongfully, privily, and without the knowledge of the defendant, escaped from and out of the custody of the said defendant, as such sheriff, to places to the said defendant unknown; but that said Jenkins, before the defendant had notice or knowledge of the escape, and before the commencement of this suit, voluntarily and of his own accord returned back again into the custody of said defendant; and that defendant did thereupon keep and detain him in execution as aforesaid; and that, before and at the time when this suit was commenced, said Jenkins was in the actual custody of the defendant as such sheriff, in execution at the suit of said plaintiffs, under and by virtue of said commitment; and that defendant had no notice or knowledge of said escape, at any time before the commencement of this suit.

The plaintiffs put in a replication, taking issue upon the second plea. The cause was tried before his Hon. WILLIAM PARMELEE, recorder of the city of Albany, on the 10th January, 1843; and the jury found a verdict for plaintiffs upon both issues. The defendant, upon a bill of exceptions, carried the cause to the supreme court; where, at the July term, 1843, the judgment of the mayor's court was reversed, and a *venire de novo* awarded to the circuit court for the city and county of Albany, with costs to abide the event. (*Reported* 2 *Denio,* 646.)

On the 25th of January, 1847, before the Hon. AMASA J. PARKER, at an adjourned circuit court, held in and for the county of Albany, the said cause was brought to trial.

The plaintiffs gave in evidence the recovery of the judgment in an action of *tort*, in the Albany mayor's court, upon which Jenkins was committed—the *ca. sa.* issued upon said judgment, with the return of the sheriff endorsed that he had arrested said Jenkins, and committed him to the liberties of the jail, by virtue thereof, on the 11th of June, 1842.

Dexter & Veazie *agt.* Adams.

*William J. Hadley* was then called as a witness on the part of the plaintiffs, who was objected to by the defendant's counsel on the ground of interest, to prove which the counsel for the defendant called

*John Baker* as a witness, who testified, that he heard Dexter, one of the plaintiffs in this suit, say that Hadley was the owner of the judgment; this was in August, 1842 or 1843; can't say which; thought it was after August, 1842, that he had heard Dexter say so. Whereupon the counsel for the plaintiffs gave in evidence a bond of indemnity, signed by Henry G. Wheaton and Edwin A. Doolittle, to said Hadley, in the penalty of $2,000, conditioned to indemnify said Hadley from all damages and costs of every name and nature, to which he might or could be subjected in any manner in this suit; also an assignment from said Hadley to one Benjamin Duel of said judgment, and all his claim and interest therein, and in this suit, which assignment was dated on the 13th February, 1843, and acknowledged before a commissioner on the 15th day of October, 1843. The counsel for the defendant admitted that Messrs. Wheaton & Doolittle were perfectly responsible for the amount of the bond, but insisted that said assignment and said bond did not render said Hadley a competent witness. The court overruled the objection, and the defendant excepted.

*William J. Hadley*, sworn for plaintiffs, (after the plaintiffs' counsel had offered in evidence a *capias*, tested the second Tuesday of July, 1842, and returnable the second Tuesday of August, then next,) testified,—I issued the *capias* now shown to me; I was the attorney at the time; I delivered it to John Baker, the latter part of July, or the beginning of the month of August, 1842, with instructions if he ever saw John F. Jenkins off the limits, to deliver it to a messenger and instruct him to take it forthwith to Mr. Allen the coroner. Baker had not any other *capias* in my handwriting at that time. This *capias*, and the endorsement on it, is in my handwriting, except the coroner's return, and the time of receipt and filing of it.

Being *cross-examined*, he testified,—there was another *capias*

Dexter & Veazie *agt.* Adams.

of the same teste and return in the hands of George Jenkins. I issued that one, and it was issued for the same reason as the one in question. I don't recollect what instructions I gave George Jenkins when I delivered him the writ, but, I have no doubt, substantially the same as those I gave Baker. I had, before that, issued another *capias* for the same purpose, tested in June and returnable in July; I delivered that to Baker; I think I delivered the first *capias* to Baker in the police office, with the same instructions as those before stated; I did not request Baker to watch to see him off the limits; I think I told Baker that Jenkins had connections in Hudson, and that I understood he was in the habit of going down there. My object in telling him this was, that if Baker should see Jenkins on the boat going down, then the suit should be commenced; I supposed he would go on the boat if he went down at all; I don't recollect certainly where I delivered the second *capias* to Baker; I think it was in the police office; I do not recollect that I have issued or made out any other *capias* than those three. I watched once to see if Jenkins went off the limits; I don't remember whether any person was with me then with a *capias*; I was the owner of the judgment at the time I issued the first *capias* in this case. I don't recollect the precise time when I became the owner of the judgment; I was the owner of the judgment at the time the *ca. sa.* was issued; I bought the judgment through Mr. Wheaton; I was in an alley leading from Grand street one afternoon, between the hours of 2 and 6 o'clock, sometime between the months of May and August, 1842; I can't now tell nearer the time; I could see, out of that lane, persons as they passed down Grand street; this alley is on the east side of Grand street; I can't say that I expected to see Jenkins pass there; I went there, thinking it likely he would pass down there; Mr. Loveridge, the then police magistrate, told me he thought it likely he would pass down there; he told me this in the police office; I don't recollect who was present at that time; I can't say whether it was the same day or the day before, that I went into the alley to watch for Jenkins; I don't recollect whether

Dexter & Veazie *agt.* Adams.

I saw Baker or Mink at the police office that day. I think I saw Jenkins in Lydius street, just as I was coming away; I staid there probably half an hour, perhaps longer; I was told there was a Mrs. Carmichael living down there, where Worcester used to go. Mr. Loveridge told me this as clerk to the district attorney; I had suspicions that Jenkins was going there to see Worcester; I was told by Mr. Loveridge, that Jenkins would be likely to go down there to see Worcester. Mr. Loveridge told me, Jenkins had made a complaint against Worcester before him, for obtaining money from him by false pretences, and he thought Jenkins would go down to see if he could not arrange it with Worcester, and he wanted me to · tell Mr. Wheaton, who was then district attorney, that Worcester was in town, and might be arrested by the officer who had the bench warrant. Worcester had then been indicted for perjury, and had absconded from the city, as I understood; I think there was not more than one person with me there; I don't recollect having any conversation with Mink or Baker the next day at the police office; Baker and Mink were then police constables; I was then clerk to the district attorney, and superintended the issuing of subpœnas, &c. George Jenkins was principally the officer employed by the district attorney; I don't think that Baker, and Mink, and Jenkins did the principal part of the business of the district attorney; Nixon did as much, or more than either Baker or Mink; and some other officers did as much as they did. Baker and Mink were, however, employed in serving process. I knew a constable by the name of Frisby, in 1842; Frisby occupied the upper part of the same house that I lived in at that time; that house was off the limits. I don't know that a note was put in the Mechanics' and Farmers' Bank, with Frisby's endorsement; Jenkins was notary to that bank. I went down to dinner one day, when I thought it likely he would come down to protest a note, which I supposed was Frisby's note; I don't know whether he was coming to demand payment or to give notice of protest. Baker and Mink came to my house on the morning on which it is said the escape took place; Baker told me that Mink had

delivered the *capias* to Allen; this was shortly after 7 A. M. I should think; I think they rang the bell; I was up at that time; I can't tell precisely the conversation that took place then; the first thing I recollect, is Baker saying that Mink had delivered the *capias* to the coroner; I don't know that he said that in those very words; he did not, nor did either of them in effect say, " now counsellor, we've got him at last." I will not swear positively that I did not ask either of them whether they were sure they had done it up right; I don't recollect whether I saw them in the office the same day; I think it likely that something was said about the suit in the office that day; whether Baker and Mink were there or not, I can't say; I do not recollect what I got for this judgment when I sold it; I transferred it in a settlement with the present owner, who is my father-in-law; I can't tell how many trials had been had in this suit when I transferred it; I think it was transferred the day the assignment bears date, which is the 15th September, 1843. I think this cause had been tried as often as twice before the assignment was made. It was not a part of my object, in assigning the judgment, to enable me to be a witness; I knew, as matter of law, that as long as I was the owner of the judgment I could not be a witness; I owed my father-in-law at the time of the assignment; he was not pressing me for payment. I do not know that he had any particular anxiety to have this judgment. Esquire Loveridge is dead.

Being *re-examined,* he testified,—Worcester had been indicted for perjury, and had absconded, and had not been arrested at the time Loveridge spoke to me.

*George Jenkins,* sworn for plaintiffs, testified,—I know John F. Jenkins; on the 4th of August, 1842, I was on the pier in the morning; I saw John F. Jenkins there; it wanted about 10 minutes of 7; I first saw him coming off State street bridge on the pier; he walked on to the dock, and after waiting a few minutes, went on board the steamboat next to the pier; I think it was the Albany he went on board of; I don't recollect whether there was any other boat between her and the pier; I saw him as much as 40 feet from the pier, east of the pier;

Dexter & Veazie *agt.* Adams.

I was in the steamboat office on the south side of State street bridge, in the second story, at the time he was this distance from the pier; Baker and Mink came into the room two or three minutes before I saw Jenkins pass it; and a few minutes before, I cannot state the precise time, I then saw Baker hand Mink a paper while Jenkins was this distance from the pier, similar to the one shown me; it was in Hadley's handwriting, and this *capias* is in Hadley's handwriting. When Baker handed the paper to Mink, he told him to take it to Mr. Allen, or to the coroner, and they then went down stairs. My impression is, that Jenkins went on the outside guards of the boat; the distance where he was, was at least 40 feet from the dock.

Being *cross-examined*, he testified,—I got to the pier before 7 o'clock that morning; I don't recollect whether Mink or Baker was there before I got there or not; I think they came up a few minutes before I saw Jenkins; I know Matthew Wellington, the driver of the Congress Hall omnibus; I believe I saw him there that morning; I think I saw Mink step on to the wheel and speak to Wellington, before he and Baker went up into the steamboat office; this was before I went up into the steamboat office; I don't recollect that I saw Baker with Mink at that time; I saw them together either a few minutes before or after that; I was watching for Jenkins, and I supposed Baker and Mink were watching for Jenkins. When John F. Jenkins came in sight, Baker and Mink were together in the steamboat office, and Baker said "there he goes," or "here he comes." (This expression of Baker's was objected to by plaintiffs' counsel, and the objection overruled, and plaintiff excepted to the decision.) John F. Jenkins was then coming across the bridge towards the pier; I was sitting at another window in the steamboat office, or a short distance from Baker and Mink; I can't say whether I had any conversation with Baker and Mink that morning, before I went up into the steamboat office; I do not know the width of the Albany; I should think she was more than 40 feet wide.

On being *re-examined*, he testified,—I was one of the city constables at that time, but not one of the police constables;

it was not a part of my duties to attend at the departure of boats.

*Benoni C. Allen,* sworn for the plaintiffs, testified,—I was one of the coroner's in 1842, (and being shown the *capias* by which this suit was commenced, said) I received that *capias* the 4th of August, 1842, a little past 7 o'clock in the morning; Mink gave it to me; Baker and Mink came together. (It was then proved that the limits extended only 30 feet east of the pier. Here the plaintiffs rested.)

The defendant, to maintain the issue on his part, called as a witness—

*Stewart Rose,* who, being sworn, testified,—I knew Matthew Wellington; he is dead; he died a year ago last fall or last spring; I saw him after he was dead.

*Samuel Stevens,* sworn for defendants, testified,—I tried this cause in April, 1845; I examined Matthew Wellington, and took minutes of his testimony, and believe my minutes contain a true statement of his testimony. The following is the evidence of said Wellington, as read to the court:

*Matthew Wellington* was then introduced as a witness on the part of the defendants, and testified that he was in the employ of Mr. Landon, in the summer of 1842. Mr. Landon kept the Congress Hall, near the capitol, in the city of Albany, and witness was employed by him to drive his omnibus, to take passengers from Congress Hall to the steamboat, and from the steamboat to Congress Hall, during the summer of 1842, and had been so employed for about a year before that time; witness recollects being on the pier with the omnibus one morning in August, 1842, before 7 o'clock in the morning, at a time when he was requested to carry a message to John F. Jenkins; witness don't recollect the day of the month. Charles Mink was the person who requested witness to take the message to Mr. Jenkins; Mink came up to witness on the omnibus, and requested witness to stop at the house of John F. Jenkins, and tell him that Mr. E. C. Delavan was on board the steamboat Albany, and wanted to see him (Mr. Jenkins) before the boat started for New-York, at 7 o'clock; Mink gave witness two

shillings to deliver the message, and told witness that he (witness) need not tell Mr. Jenkins who sent the message to him ; witness was acquainted with Mink ; witness drove up to Mr. Jenkins' door, at the corner of State and Chapel streets, and saw his girl sweeping at the door, and asked if Mr. Jenkins was in ; she said he was, and witness delivered the message to her; witness had a conversation with Mink, about this transaction, the evening of the next day.

The counsel for the plaintiffs objected to that conversation being given in evidence, and the objection was sustained by the court, and the defendant's counsel excepted. The defendant's counsel then offered to prove that, in that conversation, Mink admitted the message which he sent by the witness was false, and was intended to get Jenkins off the limits, and exulted in the success of his plan in getting Jenkins off the limits. This was objected to by the counsel for the plaintiffs, and excluded by the court; to which decision the counsel for the defendant excepted.

The witness further testified,—that it was between half-past six and seven o'clock in the morning, when Mink requested him to deliver this message to Mr. Jenkins. No other occurrence of this kind ever took place between witness and Mink ; witness did not take notice of John Baker and George Jenkins being there that morning ; witness heard that same evening, that the sheriff had been sued for Jenkins going off the limits that morning.

On being *cross-examined*, the witness further testified,—that the morning Mink requested witness to take this message to Mr. Jenkins, was the latter part of July or beginning of August ; witness first saw Mink that morning on the pier, at the foot of State street, a minute or so before he gave witness the message ; he was not doing anything, that witness saw ; he was coming towards the omnibus where witness sat ; did not see any other person with him ; witness was sitting on the omnibus ; witness' omnibus was not moving,—the way was stopped so that witness could not drive on ; then witness told the girl at Mr. Jenkins' door that Mr. Delavan was on the steamboat

Dexter & Veazie *agt.* Adams.

Albany, and wanted to see Mr. Jenkins, and told her Mr. Jenkins had got to be down there before 7 o'clock, for the boat would go away at that time; witness don't recollect that he told him anything else.

*John F. Jenkins*, offered as a witness on the part of the defendant, was objected to on the ground of interest, to obviate which a release was produced in the words following:

*Albany Mayor's Court :*

[*Title of the cause.*]—Know all men by these presents, that I, Amos Adams, sheriff of the city and county of Albany, the defendant above named, in consideration of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, have, and by these presents do forever release and discharge John F. Jenkins of and from all liability and responsibility to me of every kind or nature whatever, upon or under a certain bond, executed by him and Thomas W. Olcott to me, as sheriff of the city and county of Albany, in the penalty of two hundred and fifty dollars, bearing date the eleventh day of June, 1842, conditioned that if the said Jenkins should remain a true and faithful prisoner of said sheriff, and should not at any time, or in any manner, escape or go without the limits or boundaries of the liberties established for the jail of the county of Albany, until discharged by due course of law, then said bond was to be void, else to remain in full force and virtue.

Witness my hand and seal this 10th day of January, 1843.

AMOS ADAMS. [L. S.]

In the presence of
P. CAGGER.

*Peter Cagger*, sworn for defendant, testified,—I saw Adams execute the release, and deliver it to Jenkins; I drew the release; it was all done in my presence; it was done in court; there was no consideration passed between the parties; it was done at my request, but no money was paid at the time; defendant did not execute the release until Olcott (the bail to the sheriff) gave a written consent that he should do so.

*John F. Jenkins,* again offered as a witness on the part of the defendant, was objected to on the ground of interest, and sworn on his *voir dire,* and testified,—I executed a bond to the sheriff, together with Thomas W. Olcott, on my first commitment to the limits; it was the ordinary limit bond; I did not pay the sheriff anything for executing this release, directly or indirectly.

The plaintiffs' counsel still insisted that witness Jenkins was not competent; that there being no consideration for the release, it was void; and generally, that there lease did not discharge the witness Jenkins from liability under the circumstances of this case. The court overruled the objection, and decided that Jenkins was a competent witness; and the plaintiffs then and there excepted.

*John F. Jenkins,* sworn for defendant, testified,—in August, 1842, I was confined to the limits in this city; I was on the limits on a *ca. sa.* in favor of the plaintiffs in this suit; I was not confined or on the limits on any other judgment or process at that time; I lived then on the northwest corner of Chapel and State streets; I remember going to the steamboat on the morning of the 4th of August, 1842.

The counsel for the plaintiffs then objected to the defendant's proving that any message had been sent to Jenkins. The objection was overruled, and the plaintiffs then and there excepted.

The witness testified,—[I was awoke by my wife on that morning, and told by her that a message had come from Mr. Delavan; that he wished to see me on board of the steamboat. In consequence of that information, I arose and dressed myself as soon as possible, and went down stairs, and there saw the girl Susan, and asked her who gave the information, or who called, and she said the driver of the Congress Hall omnibus.]

All of which evidence included in brackets, was objected to, and the objection was overruled, and the plaintiffs' counsel excepted.

I then left and went immediately down to the boat; after getting on the pier, I stopped a few moments to see if I could

see Mr. Delavan, and not seeing him or any person that knew him, I went on to the boat and ascertained to my satisfaction that he was not there, and returned ; I think it could not exceed two minutes from the time I left the pier to go to the Albany until I returned to the pier again ; this message was the sole inducement to my going on to the boat.

Being *cross-examined*, he testified,—the reason why I stopped on the dock, was because I did not know but I should pass the limits if I went on the boat ; I did not know where the limits extended into the river ; I had the impression they extended to the centre of the river, though I was not certain of it ; I went to the sheriff's office and examined the limits on the map kept there ; the reason I did not remain longer on the boat was that I did not know but I might be off the limits.

*Edward C. Delavan*, sworn for the defendant, testified,—I resided at Ballston in the summer of 1842.   John F. Jenkins was my agent for transacting my business in the city of Albany, during the summer of 1842, and had been for some time previous thereto.

The counsel for the defendant then offered to prove, by this witness, that the witness had not sent any message to Jenkins to come to see him on the steamboat Albany, on the morning in question, and that he (Delavan) was not then in the city of Albany.   The receipt of this evidence was objected to on the part of the plaintiffs.   The objection was overruled, and the plaintiffs then and there excepted.

The witness then testified,—I did not send any message by any person to Jenkins to come to me on the steamboat Albany, in the month of August, 1842, or at any other time ; I did not go from this city to New-York during that month.

Here the defendant rested.

*William J. Hadley*, recalled for plaintiffs, testified,—I was never informed, prior to the first trial of this cause, of any fact by which Jenkins was induced to leave the limits ; I never gave Mink any authority whatever, nor did I give Baker any other authority than what I have testified to ; the first I heard of anything about the message being sent to Jenkins, or that

Dexter & Veazie *agt.* Adams.

any means had been made use of, to induce him to leave the limits, was over a week after the suit was commenced; and it was then reported to me that Mr. Cagger had said so; till I heard this report, as from Cagger. I never heard that any means whatever had been used to get Jenkins off the limits.

The above was all the testimony given in the cause, and the testimony was announced to be closed. And the court then adjourned until the following morning. Upon the coming in of the court the following morning, his honor, the circuit judge, then determined he would strike out the inquiry put by Jenkins to his servant girl, upon his going down stairs on the morning in question, and her reply to the inquiry; and ordered the same stricken out accordingly; and declared the same was not evidence in the cause.

The counsel for the plaintiffs then insisted upon their right to recall the witness Jenkins, or to call other testimony. The court refused to allow the witness to be recalled, in to allow the plaintiffs to call other testimony; and the plaintiffs then and there excepted.

His honor, the circuit judge, after stating to the jury the nature of the action, and of defendant's liability, charged them, as matter of law, that if they should find, from the evidence given in the cause, that the escape of Jenkins from the limits for which the defendant was sought to be charged in this case, was procured by the fraud of the agent whom Hadley, the then owner of the judgment, had employed to commence this suit, for the purpose of enabling Hadley to collect this debt of the defendant, the plaintiffs could not recover. That it was a conceded fact, that Baker was employed by Hadley, as his agent, to commence this suit; Hadley made out the *capias* by which the suit was commenced, and gave it to Baker, with instructions, that if he saw Jenkins off the limits, to give the *capias* to a messenger, to be taken immediately to the coroner. If the jury should find, from the testimony, that Jenkins had been induced by trick, or fraud, or deception, on the part of Baker, either alone or in conjunction, and by concert with Mink; and that such trick, or fraud, was resorted to by Baker for the bene-

fit of Hadley, and to enable him to charge the defendant with this debt, although Hadley himself was ignorant of the means employed, they should find a verdict for the defendant ; whether Jenkins had been decoyed from the limits by any trick or fraud of Baker, or of Baker and Mink together, for the benefit of Hadley, and to enable Hadley, by this suit, to collect his debt against Jenkins, of the defendant, was a question solely for the jury upon the evidence ; and the burden of proving these facts, lay with the defendant, and it was for the jury to say, from the evidence, whether they had been made out.

His honor, the circuit judge, then recapitulated the evidence, and submitted the cause to the jury, with the instruction, that if they were not satisfied, from the evidence, that the escape in question had been procured or induced solely by the fraud and trick of Baker, or Baker and Mink acting in concert; and also, that such fraud or trick, if any, was resorted to for the benefit of Hadley, to enable him to recover of the defendant the amount of the judgment for which Jenkins was committed to the limits, the plaintiffs would be entitled to their verdict for the amount of the judgment against Jenkins.

To the whole, and to each and every part whereof, the counsel for the plaintiffs then and there excepted.

The counsel for the plaintiffs requested the court to charge the jury, that it was no defence to this suit, if Jenkins, the prisoner, was induced by fraud or deception to leave the limits, unless it was shown that the then owner of the judgment was cognizant of it, or a party to the fraud or deception, or had authorized it. The court refused so to charge, and the counsel for the plaintiffs excepted.

The counsel for the plaintiffs also requested the court to charge the jury, that if Baker had no authority from the then owner of said judgment, to commit said alleged fraud, or to participate in it, and that if he (said Baker) was cognizant of, or participated in it, it was his own act and not the act of the owner, nor is he liable for it. The court refused to charge as requested, and the counsel for the plaintiffs excepted.

The counsel for the plaintiffs also requested the court to charge the jury, that if knowledge or participation on the part of Baker, of the fraud by which Jenkins was alleged to have been induced to leave the limits, constitutes a defence, that then there is no evidence ; or, if any, not sufficient evidence of any such knowledge or participation. The court refused so to charge, and stated that this was a question of fact for the jury ; and the plaintiffs then and there excepted.

The counsel for the plaintiffs also requested the court to charge the jury, that if they believed that the prisoner, Jenkins, was aware, at the time he went on to the steamboat Albany, he forfeited his limit bond, and made the sheriff liable for an escape, whether the message he had received as to Mr. Delavan was true or false, and with such knowledge, knowingly, intentionally, and with deliberation, after some minutes hesitation, went on to said boat, off from the limits, that then the defendant was liable, though the message as to Mr. Delavan's wish to see him was false. The court refused so to charge, and charged the jury, that if Jenkins was in doubt as to the extent of the limits, and was induced to go over the line by the false message of Mink, sent for the purpose of enticing Jenkins off the limits, and enabling the owner of the judgment to sue the sheriff, and if Mink acted in conjunction with Baker, the agent of Hadley, in sending said false message, and procuring said escape, then the plaintiffs could not recover. To which refusal to charge, and to which charge, the plaintiffs' counsel excepted. ·

The counsel for the plaintiffs also requested the court to charge the jury, that if they believed Jenkins left the limits without being deceived as to any material fact, necessary or proper for him to know, in order to determine the question of his right to leave the limits, it does not constitute a defence. The court refused so to charge, and charged the jury, that if Jenkins was inveigled off the limits by a false message, and thus induced to leave the limits by the plaintiffs, or their agent, it was a defence, whether the fraud related to the question of extent of limits, or otherwise. To which refusal to charge,

50

Dexter & Veazie *agt.* Adams.

and to which charge, the counsel for the plaintiffs then and there excepted.

The jury found a verdict for the defendants.

The supreme court, at July term, 1847, affirmed, and rendered judgment upon the verdict at the circuit.

BEARDSLEY, J., delivered the opinion of the court as fol lows :

" In my view of this case, there was no error in allowing Jenkins to be sworn and examined as a witness for the defend- ant. It was urged on the argument, that notwithstanding the release executed by the defendant, the witness still remained liable to Olcott, who was surety in the bond for the limits, and was bound to indemnify him against all damages which he might incur by means of the escape. This objection was not made on the trial ; and if it had been, it probably would have been obviated at once by a release from Olcott, as it ap- pears he assented to the execution of the one made by the de- fendant. But the point, as now presented, not having been made on the trial, cannot be regarded, whatever might have been its effect if taken at the proper time.

" Assuming that Jenkins, independently of his bond for the limits, would have been liable to indemnify the defendant for an escape, if one had occurred—a point upon which no opinion is intended to be expressed—such liability was merged in the higher security, the bond ; and did not exist when the release was executed. . Besides, this point was not made on the trial. If the plaintiffs intended to insist that the release was defective in form, or in the manner of execution, they were bound to make the objection in a specific form, that the defect might be ob- viated. A general objection, such as was made, ought not to be regarded.

" The main point in this case was disposed of when it was formerly before the court, (2 *Denio*, 646,) and it is only mate- rial now to advert to one aspect of the case which was not then presented.

" The judge was asked, by the plaintiffs' counsel, to charge that if Jenkins knowingly went beyond the limits, intending so

to do, defendant was liable for that escape, notwithstanding the fraudulent misrepresentation by which Jenkins was induced to go where he did. The judge refused so to charge, and as I think correctly; for there was no evidence on which that point could arise. The only witness on this part of the case was Jenkins; and he testified that he did not know where the jail limit was at that place, although he thought it was in the centre of the river. Of this, however, he had no certain knowledge; and the jury would have been warranted in finding that he was in doubt whether the place to which he went, was·or was not beyond the jail limit, although they could not, on this evidence, have come to the conclusion that he knew he was passing beyond the prescribed boundary. The judge charged that it was not enough to show that Jenkins was in doubt as to the boundary; and that, if he was induced to go beyond the line by the trick and fraud of the agent of the owner of the judgment, acting with a view thereby to aid such owner in collecting the amount of the sheriff, the action could not be maintained, although a doubt might have been entertained by Jenkins as to the place of the boundary of the jail liberties. There was no error in this, or any other part of the charge, and a new trial should be denied."

New trial denied.

The plaintiffs brought their writ of error, and came to this court.

H. G. *Wheaton, attorney and counsel,* and
R. W. *Peckham, counsel,* for plaintiffs in error.

*First.* The court erred in charging the jury, as in substance it did, that if they found that Jenkins was induced to leave the jail limits by the false message sent to him by Mink, and that Mink and Baker were acting in concert in sending the message, and that the message was sent for the purpose of enticing Jenkins off the limits, and enabling Hadley to collect his judgment of the sheriff, the plaintiff could not recover. And in refusing to charge the jury, that the fact of the prison-

---

Dexter & Veazie *agt.* Adams.

---

er's being induced to leave the limits by fraud or deception, did not constitute a defence to this suit, unless Hadley, the owner of the judgment on which he was imprisoned, was in some way cognizant of, or a party to the fraud or deception, or had authorized it.

Because one man can never be held responsible for the fraudulent act of another, in a case like this, unless he has either authorized it before hand, or, it being done for his benefit, has approved of, or ratified it after it was done and had come to his knowledge. And it is clearly proved in this case, that the act complained of was not authorized by Hadley, the party sought to be held responsible for it, before it was done ; and it is not proved that, after it was done and came to his knowledge, he approved of or ratified it.

1. The duty of the sheriff, as defined by the *Revised Statutes* and at common law. (2 *R. S.* 437, § 63 ; *Alsept* v. *Eyles*, 2 *Hen. Black.* 108 ; *Raines, ex'r* v. *Dunning*, 2 *Mar.* 386 ; *Elliot* v. *Norfolk*, 4 *T. R.* 789 ; 1 *Rol.* 808, *L.* 7.)

2. What will discharge the sheriff from liability consequent upon the escape of his prisoner ? (*Cary* v. *Turner, sheriff*, 6 *Johns. R.* 51 ; *Kellogg* v. *Gilbert*, 10 *Johns. R.* 220 ; *Cargill* v. *Taylor*, 10 *Mass. R.* 206 ; *Sweet* v. *Palmer*, 16 *Johns. R.* 181 ; *Patten* v. *Halstead, Cox's Rep.* 277 ; *Vin. Ab. Escape, N.; Crompton* v. *Ward*, 1 *Strange*, 429.)

3. The nature and extent of the agency of Baker. (*Story on Agency*, § 126, §§ 17 *and* 18 ; *Fenn* v. *Harrison*, 3 *T. R.* 754 ; *Gibson* v. *Colt*, 7 *Johns.* 390 ; *Paley on Agency, by Dunlap*, 202, *note a.*)

4. On the subject of the ratification of an unauthorized act of an agent, or of a stranger, done with intent to benefit the principal. (*Story on Agency*, §§ 248, 249, 250, 252, 253, 254, 255, 256, 258 ; *Owings* v. *Hull*, 9 *Peters*, 607, 629 ; *Hays* v. *Stone*, 7 *Hill*, 128 ; *Paley on Agency, by Dunlap*, 171, *note o.*)

5. On the subject of the liability of the principal for the *torts* of the agent. (*Story on Agency*, §§ 452, 453, 454, 455, 456, 459 ; *Smith Merc. L.* 66.)

*Second.* No fraud was committed upon Jenkins to induce him to leave the limits, because—

1. No fact was misrepresented to him necessary or material for him to know, in order to enable him to judge of the propriety or legality of his leaving the limits—the misrepresentation alleged being confined to a fact, which could in no way mislead him as to his rights or responsibilities as a prisoner, and the truth or falsehood of which, so far as those rights or responsibilities were concerned, was entirely indifferent.

*Third.* The court erred in refusing to charge the jury, that if they believed the prisoner Jenkins was aware, at the time he went on to the steamboat Albany, he forfeited his limit bond, and made the sheriff liable for an escape, whether the message he had received as to Delavan, was true or false, and with such knowledge, after some minutes hesitation, went deliberately off the limits on to the boat, that then the defendant was liable though the message, as to Delavan's wish to see him there, was false.

*Fourth.* The court erred in admitting the testimony of John F. Jenkins, he being interested in the event of the suit; and the release executed by the sheriff did not divest him of that interest.

1. The release executed by the sheriff is confined entirely to the witness' liability under the bond he had executed to the sheriff, and described in the release, the surety being still liable to the sheriff on the bond. Now, suppose a recovery to be had against the sheriff, he would be entitled to recover the amount of the surety, and would not the witness be liable to the surety for the full amount he should have to pay the sheriff? The sheriff's release, therefore, to the witness, executed by the consent of the surety, left the surety liable to the sheriff, and the witness to the surety. The release, therefore, in no way relieved the witness from his interest in the event of the suit. His interest after the release, remained equally certain and fixed.

2. Without any bond, the witness was interested in the event of the suit.. The sheriff was sued for a negligent, not

for a voluntary escape. After the arrest, it was the duty of the prisoner to remain in custody, according to law. It was a wrong to the sheriff for him to leave the limits, and if the sheriff sustains damages in consequence of the prisoner leaving the limits, he is liable to the sheriff for the damages. Notwithstanding. the release from the bond, the common law liability to the sheriff still remained. (*Alsept* v. *Eyles*, 2 *H. Black.* 108; *Appleby* v.. *Clark*, 10 *Mass. Rep.* 59; *Vin. Ab. Escape*, *I. Cro. E.* 237, 293, 53.)

☞ 9 *Wheat.* 651—sheriff may give the limits without a bond. 2. *R. S.* 434, §§ 47, 40. ☜

3. The objection to the witness Jenkins, on the ground of interest, after execution of the release, was sufficiently specific, unless the court or opposite party called for a specification of the particular in which it was alleged his interest remained. (3 *H.* 395; 17 *W.* 257.) ·

☞ R. W. Peckham, in reply.—*Question of agency is not in the case*, as tried and passed upon by the supreme court. Only question put to the jury was, whether act was done for plaintiffs' benefit. Ratification and adoption was the point tried. ☜

*Cagger & Stevens, attorneys,* and
*Samuel Stevens & N. Hill, jr., counsel,* for def't in error.

*First.* John F. Jenkins was a competent witness.

1. He was released from all liability on his bond to the sheriff.

2. That release having been given with the consent of Mr. Olcott, (the surety,) released Jenkins from all liability to respond to the surety.

3. The release was executed to enable Jenkins to be examined as a witness for the benefit of the surety, as well as the sheriff. This would be a conclusive defence to a suit by either of them against Jenkins,.for any liability to them which would have rendered him incompetent as a witness. (11 *More*, 342; *C. & H.* 365, *mentions the case.*)

4. This objection was not taken on the trial; had it been,

it could have been obviated by a release from Mr. Olcott, and cannot therefore be urged here. (*W.* 142, 143; *W.* 562, 563.)

5. Jenkins was under no liability to the sheriff, except what arose from the bond. He was never confined to the four walls of the prison, and if he had given no bond for the limits, his escape from the limits would have been a voluntary escape, for which the sheriff would have had no remedy against him.

6. But if this were otherwise, the release was executed to render Jenkins disinterested and competent, as a witness in behalf of the releasor. This would preclude him from afterwards claiming or enforcing against Jenkins any liability which would have rendered him incompetent as a witness.

7. This objection was not taken at the circuit; had it been, it could have been obviated by a further release from the sheriff, and will not therefore be listened to now.

*Second.* All the other decisions of the circuit judge, in relation to the admission of evidence, were correct, provided his charge to the jury was correct.

*Third.* The circuit judge committed no error in his charge to the jury.

1. A plaintiff cannot maintain an action for an escape procured by himself, or by his own fraudulent devices. (*Van Wormer* v. *Van Vorst*, 10 *Wend.* 356.)

2. The same consequences necessarily follow, if the escape be procured by the fraudulent contrivances and devices of the agent of the plaintiff.

3. The fraud of an agent is imputable to the principal, although committed without his authority, knowledge or assent. (*Story on Agency*, § 452; *Per* PARK, B., in *Cornfoot* v. *Fowke*, 6 *M. & W.* 373; 1 *Salk.* 289; 2 *H.* 461; *Story on Agency*, § 140; 23 *W.* 260.)

This principle extends to sub-agents employed by the immediate agent of the principal. (*Id.* § 554.)

The jury in this case, have found that the escape, for which the plaintiffs seek to charge the sheriff, was procured by the fraudulent device and contrivance of Baker, acting in concert

with Mink,—Baker being the agent of Hadley, (the plaintiff in interest,)—for the purpose of commencing a suit to charge the sheriff with this debt, if Jenkins should escape from the limits ; and that this fraud was resorted to by Baker, to enable him successfully to do the very thing which he was authorized by Hadley to do, to wit, to commence a suit against the sheriff for the escape, and thus charge him with this debt.

If Baker, at the time of concocting and carrying into effect this fraudulent scheme to enable Hadley to charge the sheriff with this debt, had not been the agent of Hadley for any purpose, Hadley could not avail himself *of the fruits of this fraud,* concocted and executed for his sole benefit, without subjecting himself to all the consequences of such fraud. He cannot adopt the escape, which was procured solely for his benefit, and repudiate the means by which it was procured ; he must adopt all or none of the unauthorized acts of the person acting as his agent, and for his benefit. *Smith's Commercial Law,* 114, 115, 3d ed., *by Holcombe & Gholson.*)

The attempt to reap the benefit arising from such fraudulent act, is an adoption of the act itself ; and renders Hadley responsible for all its consequences, as much as though it had been done by his previous command. (*Story on Agency,* § 455.)

*Fourth.* His honor, the circuit judge, committed no error in refusing to charge as requested by the plaintiffs' counsel.

1. The first and second requests (*pp.* 33, 34,) are simply the converse of what the judge did charge.

2. The third proposition required the judge to decide a question of fact. He committed no error in refusing to comply with such request, but properly submitted it to the jury.

3. The fourth request was properly refused by the judge. There was no evidence to justify the instruction required.

4. The fifth and last request, is merely the converse of the principle answered in the charge which had been given.

☞ *N. Hill, jr.,* same side. ☜

DECISION.—*Judgment affirmed, unanimously—with defendant's taxed costs, and one-half thereof in addition.*

Dexter & Veazie *agt.* Adams.

NOTE.—The supreme court, BEARDSLEY, J., *held,* that there was no error in allowing Jenkins to be sworn and examined as a witness for the defendant. The objection that the witness, notwithstanding his release by defendant, still remained liable to Olcott, his bail, was not made on the trial; and could not be regarded in that court.

Assuming that Jenkins, independently of his bond for the limits, would have been liable to indemnify the defendant for an escape, such liability was merged in the higher security—the bond; and did not exist when the release was executed. But this point was not intended to be decided, nor was it made on the trial. If the plaintiffs intended to insist that the release was defective in form or in the manner of execution, they were bound to make the objection in a specific form. A general objection, such as was made, ought not to be regarded.

*Second.* Baker was the agent of Hadley to commence an action against the sheriff, if Jenkins should be seen off the limits. This was the character and extent of his agency. If the escape was brought about by him and Mink, who were acting to aid Hadley and for his supposed benefit; and the latter sought to gain an advantage by the result of such labors in his behalf, he necessarily thereby became a party to what they had done.

One who endeavors to turn to his own advantage what others had assumed to do for his benefit, although without authority, is, as to such act, deemed to stand in their place; and if what the assumed agents had done was fraudulent as to themselves, it was equally so as to him who thus adopts and assumes it.

In this case, therefore, there was no escape from the limits, for which Hadley could have redress. In effect, he procured it; and therefore the action would not lie.

*Third.* The charge of the circuit judge was correct, in stating, that it was not enough to show that Jenkins was in doubt as to the boundary of the limits; and that, if he was induced to go beyond them by the trick and fraud of the agent of the owner of the judgment, acting with a view thereby to aid such owner in collecting the amount of the sheriff; the action could not be maintained, although a doubt might have been entertained by Jenkins, as to the place of the boundary of the jail liberties.

*Not reported.*